# STATE OF FLORIDA, DEPARTMENT OF BUSINESS REGULATION, DIVISION OF ALCOHOLIC BEVERAGES AND TOBACCO v. CLUB 99, INC.

### Case No. 84-3288

State of Florida Division of Administrative Hearings

October 8, 1984

## APPEARANCES OF COUNSEL

**Sandra P. Stockwell** for petitioner.

**Michael E. Christiansen,** of **Mastriana & Christiansen,** for respondent.

## OPINION OF THE COURT

MICHAEL M. PARRISH, Hearing Officer.

Pursuant to the Respondent's election of an immediate post-suspension hearing, a final hearing was held in this case in Fort Lauderdale, Florida on September 18 and 19, 1984, before Michael M. Parrish, a duly designated Hearing Officer of the Division of Administrative Hearings.

The issue in this case is whether the Petitioner, Department of Business Regulation, Division of Alcoholic Beverages and Tobacco (DABT), should revoke, suspend, or otherwise discipline the alcoholic

beverage license number 16-1053-SRX, Series 4-COP, issued to the Respondent Club 99, Inc., trading as Shangri-La, a bar and restaurant located at 451 North State Road 7, Plantation, Broward County, Florida, upon the following grounds alleged in DABT's Notice to Show Cause issued September 14, 1984:

1) That on or about the below listed dates, you, Club 99, Inc., d/b/a Shangri-La, a retail vendor, licensed under the Beverage Law of the State of Florida, through your agent(s), servant(s), or employee(s), to wit: Richard Christian while he was on duty on your licensed premises did unlawfully possess, sell, and/or deliver controlled substances as defined in Florida Statute 893.03, to wit: cocaine, on your licensed premises, while on duty, in violation of Florida Statute 893.13(1)(a) within Florida Statute 561.29(1)(a).

| No. | Date | Time | Controlled Substance |
|-----|------|------|---------------------|
| 1. | August 10, 1984 | 9:30 P.M. | Cocaine |
| 2. | August 25, 1984 | 12:25 A.M. | Cocaine |

2) That on or about the below listed dates, you, Club 99, Inc., d/b/a Shangri-La, a retail vendor, licensed under the Beverage Law of the State of Florida, through your agent(s), servant(s), or employee(s), to wit: Everett Campbell, while he was on duty on your licensed premises did unlawfully possess, sell, and/or deliver controlled substances as defined in Florida Statute 893.03, to wit: cocaine on your licensed premises, while on duty, in violation of Florida Statute 893.13(1)(a), within Florida Statute 561.29(1)(a).

| No. | Date | Time | Controlled Substance |
|-----|------|------|---------------------|
| 1. | August 19, 1984 | 12:10 A.M. | Cocaine |
| 2. | August 23, 1984 | 11:00 P.M. | Cocaine |
| 3. | August 24, 1984 | 11:20 P.M. | Cocaine |
| 4. | September 6, 1984 | 12:57 A.M. | Cocaine |

3) That on or about the below listed dates, you, Club 99, Inc., d/b/a Shangri-La, a retail vendor licensed under the Beverage Law of the State of Florida, through your agent(s), servant(s), or employee(s), to wit: Adam Burnett while he was on duty on your licensed premises did unlawfully possess, sell, and/or deliver controlled substances as defined in Florida Statute 893.03, to wit: cocaine, on your licensed premises, while on duty, in violation of Florida Statute 893.13(1)(a), within Florida Statute 561.29(1)(a).

| No. | Date | Time | Controlled Substance |
|-----|------|------|----------------------|
| 1. | August 25, 1984 | 12:20 A.M. | Cocaine |
| 2. | August 30, 1984 | 12:10 A.M. | Cocaine |
| 3. | September 1, 1984 | 12:40 A.M. | Cocaine |
| 4. | September 6, 1984 | 12:50 A.M. | Cocaine |

4) That on or about the below listed dates, you, Club 99, Inc., d/b/a Shangri-La, a retail vendor licensed under the Beverage Law of the State of Florida, through your agent(s), servant(s), or employee(s), to wit: Tony Brown, while he was on duty on your licensed premises did unlawfully possess, sell, and/or deliver controlled substances as defined in Florida Statute 893.03, to wit: cocaine, on yuour licensed premises, while on duty, in violation of Florida Statute 893.13(1)(a), within Florida Statute 561.29(1)(a).

| No. | Date | Time | Controlled Substance |
|-----|------|------|----------------------|
| 1. | August 31, 1984 | 12:10 A.M. | Cocaine |

5) You, Club 99, Inc. d/b/a Shangri-La, licensed under the Beverage Laws, your servant, agent, or employee, to wit: Don did violate Florida Statute 561.29(1)(a) to wit: did allow violation of the law of this State to occur on the licensed premises by allowing the sale of cocaine on September 12, 1984 from Everett Campbell to Detective Anderson.

6) That on and between August 10, 1984, and the date of service of this Notice to Show Cause, you, Club 99, Inc., d/b/a Shangri-La, a retail vendor licensed under the Beverage Law of the State of Florida, have maintained a public nuisance on your licensed premises, to wit: a place or building which is visited by persons for the purpose of unlawfully using, keeping, selling and/or delivering controlled substances in violation of Chapter 893, Florida Statutes 561.29(1)(c), 823.01 and 823.10.

7) That on and between August 10, 1984 and the date of service of this Notice to Show Cause, you, Club 99, Inc., d/b/a Shangri-La, a retail vendor licensed under the Beverage Law of the State of Florida, have maintained a licensed premise as a place which is used for keeping or selling controlled substances in violation of Florida Statutes 893.12(2)(a)5., and 561.29(1)(a).

## PROCEDURAL AND EVIDENTIARY MATTERS

The Petitioner offered 20 exhibits. All but two were received in

evidence. Among the Petitioner's exhibits received in evidence were Petitioner's Exhibit No. 2 and Exhibits Nos. 4 through 16, each of which consisted of a sealed evidence bag with its attached property receipt documentation, and each of which contained a white powder identified as cocaine. While each of these exhibits were admitted in evidence and each was shown to and visually examined by the Hearing Officer, custody of Exhibit No. 2 was returned to Mr. Oliva and custody of Exhibits Nos. 4 through 16 was returned to the Property Clerk of the City of Plantation Police Department.

The Respondent offered one exhibit into evidence, the transcript of a sworn statement by Richard Christian taken on September 17, 1984, by the Respondent's attorney in the course of his investigation of the issues raised by the Notice to Show Cause. The Petitioner objected to the transcript of the sworn statement being received in evidence. The Hearing Officer reserved ruling on the objection and provided both parties an opportunity to file post-hearing memorandums of law addressed to the admissibility of the transcript. Upon review of the post-hearing memorandums, I am persuaded that the transcript should be admitted into evidence under the particular circumstances of this case. Although the witness Richard Christian was not brought before the Hearing Officer, in light of the nature of the statements in his sworn statement (which were made at a time when he was not represented by an attorney), the fact that the witness is now represented by an attorney, and the fact that the witness has criminal charges pending against him related to the subject matters addressed in the sworn statement, I am persuaded that if Richard Christian had been called to testify in this case, he would have become an "unavailable" witness within the meaning of either paragraph (a) or paragraph (b) of subsection (1) of Section 90.804, Florida Statutes. Further, considering the nature of the sworn statement, it is sufficiently a statement against interest that, pursuant to Section 90.802(2)(c), Florida Statutes, it is not excluded by Section 90.802, Florida Statutes.[1] Accordingly, Respondent's Exhibit No. 1, the transcript of the sworn statement of Richard Christian, is hereby received in evidence in this case.

## FINDINGS OF FACT

Based on the stipulations of the parties, the exhibits received in

---

[1] Such being the case, to the extent that it is persuasive when considered in light of all the other evidence, it is sufficient to independently support findings of fact, the penultimate sentence of Section 120.58(1)(a), Florida Statutes, notwithstanding.

evidence (including Respondent's Exhibit No. 1), and the testimony of the witnesses at the hearing, I make the following findings of fact:

1. Club 99, Inc., is the holder of alcoholic beverage license number 16-1053-SRX, series 4-COP, doing business at 451 North State Road 7, Plantation, Broward County, Florida, as a bar and restaurant named Shangri-La.

2. On August 7, 1984, the Plantation Police Department began a narcotics investigation at the licensed premises known as Club 99, Inc., d/b/a Shangri-La, holding license number 16-1053-SRX, series 4-COP, located at 451 North State Road 7, Plantation, Broward County, Florida. On this date Detective Don Anderson entered the licensed premises under cover and was introduced to a white male bartender identified as Malcolm Perkins. Detective Anderson engaged in a conversation with Perkins regarding a narcotic known as MDA. Perkins explained that MDA was a mixture of heroin and speed and further stated that he could obtain MDA for Anderson at a price of $70.00 a gram or $10.00 a "hit". Detective Anderson also engaged in conversation about MDA with Scott Kiehl, the assistant manager at the licensed premises. Later that same evening Detective Anderson engaged in a conversation about cocaine with a white male bartender on the licensed premises known as "Paul" or "Miss Kitty". None of the employees with whom Detective Anderson discussed MDA or cocaine appeared to be alarmed or concerned about the discussion.

3. On August 10, 1984, at approximately 9:30 P.M., Detective Anderson again entered the licensed premises in an undercover capacity and engaged in a conversation with a white male bartender identified as Richard Christian. Detective Anderson asked if he could buy a half gram of. cocaine and Richard Christian answered in the affirmative stating that the price would be $35.00 for one half gram. Detective Anderson gave $40.00 in U.S. currency to Christian and Christian covered the money with a cocktail napkin. Christian took the money and shortly thereafter he placed a clear plastic bag containing a white powdery substance under a cocktail napkin and pushed it across the bar towards Detective Anderson. At this same time, Christian said, "It is underneath." After looking under the napkin, Anderson took the cocktail napkin and the small plastic bag and placed them in his left front pants pocket.

4. On August 17, 1984, Detective Anderson returned to the licensed premises at approximately 10:00 P.M.[2] On this occasion he met with a

---

[2] All of Detective Anderson's visits to the licensed premises between August 7, 1984

white male bartender named Malcolm Perkins. Detective Anderson asked if Perkins had obtained any MDA for him and Perkins answered in the negative. Detective Anderson asked if Perkins could get him any cocaine. Perkins answered in the negative but pointed out a waiter named Everett Campbell and suggested that Anderson ask Campbell about cocaine. Detective Anderson then approached the waiter identified as Everett Campbell and asked Campbell if he could get Anderson a half gram of cocaine. Campbell replied in the affirmative and said the price would be $35.00. Anderson agreed to the price. Later that evening Campbell approached Anderson and said that the person he gets the cocaine from was not in the bar and that, therefore, he could not deliver any cocaine to Detective Anderson.

5. On August 18, 1984, at appoximately 11:35 P.M., Detective Anderson entered the licensed premises and met with Everett Campbell. This time Campbell told Anderson that he would be able to obtain some cocaine. At approximately 12:05 A.M. on August 19, 1984, Detective Anderson gave Campbell $40.00 in U.S. currency. Campbell took the money and walked to an unknown location off the premises and returned in about five minutes. Campbell then handed Detective Anderson a small plastic bag containing a white powdery substance. Nothing was wrapped around the plastic bag. Detective Anderson held up the plastic bag to inspect it before putting it in his pocket. Two other bartenders and a large number of patrons were nearby and could have seen what was happening.

6. On August 21, 1984, at approximately 11:00 P.M., detective Anderson entered the licensed premises. Anderson struck up a conversation with a white male patron identified as Dion Burl. Detective Anderson asked Burl if he could obtain some cocaine for Anderson. Burl replied in the affirmative and stated that it would cost $40.00 for one half gram. Anderson placed a cocktail napkin over two $20.00 bills and handed them to Burl. Burl took the money and walked to an unknown location. At approximately 11:30 P.M. Burl returned. He handed Detective Anderson a white cocktail napkin and a small clear plastic bag that contained a white powdery substance. Detective Anderson took the substance and placed it in his pants pocket.

7. On August 23, 1984, Detective Anderson returned to the licensed premises and met with Everett Campbell at approximately 11:00 P.M. Campbell was working as a waiter that night. Detective Anderson

and September 11, 1984, were in conjunction with the on-going investigation. On each visit Detective Anderson was working under cover, was not in uniform, and did not identify himself as a police officer.

asked Campbell if he could obtain a half gram of cocaine for Anderson. Campbell answered in the affirmative and said it would cost $40.00. Detective Anderson gave Campbell the money and a while later Campbell handed him a magazine titled "David" and said, "It's inside." Inside the magazine Detective Anderson found a small clear plastic bag containing a white powdery substance. Detective Anderson held the plastic bag up to inspect it before putting it in his pocket.

8. On August 24, 1984, at approximately 9:30 P.M., Detective Anderson entered the licensed premises again. At approximately the same time Investigator Oliva entered in an undercover capacity as back up. Upon entering the premises Detective Anderson met with white male bartender Richard Christian and both engaged in general conversation. After a short period of time Detective Anderson asked Christian if he had any cocaine. Christian stated that he did not have any right now but for Anderson to go ahead and give Christian $35.00, and that he would have it later. Anderson complied with Christian's request and gave Christian $35.00 U.S. currency. At approximately 11:00 P.M., Detective Anderson and Investigator Oliva seated themselves at a table in the dining area of the licensed premises, where they were greeted by Everett Campbell. Shortly thereafter Anderson asked Campbell if he could get Anderson some cocaine. Campbell replied in the affirmative. Thereupon Anderson folded two $20.00 bills, placed them under a napkin, and gave them to Campbell. Detective Anderson and Investigator Oliva then saw Campbell go into the kitchen area several times. About fifteen or twenty minutes later, Campbell approached the table where Anderson and Oliva were seated and placed a folded cocktail napkin in front of Detective Anderson and said, "It's in there." Anderson unfolded the napkin and found that it contained a small clear plastic bag containing a white powdery substance. Anderson removed the plastic bag from the napkin and inspected the plastic the plastic bag by holding it up to eye level for a few seconds. Detective Anderson saw other patrons looking at him when he raised the plastic bag to eye level. After inspecting the plastic bag, Anderson put it in his pocket.

9. At approximately midnight of the evening of August 24–25, 1984, Detective Anderson and Investigator Oliva left the restaurant portion of the licensed premises and proceeded to the upstairs portion of the licensed premises, which is another lounge. After a short period of time, Anderson and Oliva were greeted by a waiter identified as Adam Burnett. Anderson and Oliva negotiated with Burnett for the purchase of cocaine. In approximately five minutes Burnett returned to the table where the officers were seated and stated that he could obtain a better

182

quality of cocaine for $40.00 in U.S. currnecy for one half gram. At this time Investigator Oliva stated that he would take the better quality of cocaine and gave Burnett $40.00 in U.S. currency. A few minutes later Investigator Oliva followed Burnett into the mens' restroom. Once inside the mens' room, Burnett handed Oliva a white cocktail napkin. Oliva took the napkin and unwrapped it. Inside was a small clear plastic bag containing a white powdery substance. Oliva held the plastic bag up to eye level to view its contents and discussed with Burnett the fact that the white powdery substance had a lot of "rocks" in it. Oliva then stated to Burnett that he was not going to do the cocaine in the bathroom because he did not trust anyone. Burnett's reply was, "It's okay. Everyone does it in here anyway." Oliva and Burnett then left the restroom.

10. A few minutes later that same evening, an unknown white male employee who had been previously working at a bar located in the downstairs portion of the premises approached Detective Anderson and Investigator Oliva and stated to Anderson, "Richard wants to see you downstairs." Anderson and Oliva proceeded downstairs to the bar located by the kitchen entrance. There Detective Anderson met with bartender Richard Christian, who told Anderson to reach into his shirt pocket. Anderson reached into Christian's shirt pocket and pulled out a folded napkin, and a small clear plastic bag which contained a white powdery substance. When Detective Anderson started to open the cocktail napkin, Christian put his hands out to close Anderson's hands in an effort to keep other people from seeing the bag.

11. On August 29, 1984, Detective Anderson again entered the licensed premises. At approximately 10:00 P.M. Detective Anderson was introduced to a white male waiter identified as Tony Brown. Anderson and Brown engaged in general conversation and after a short period of time Anderson asked Brown if he could get a half gram of cocaine. Brown stated that he should be able to obtain one and that he would check around and get back to Detective Anderson. At approximately 11:00 P.M. Brown approached Detective Anderson and stated that he had checked around, but was unable to obtain any cocaine. On the same date, at approximately 11:30 P.M., Detective Anderson met with waiter Adam Burnett and engaged in general conversation and after a short period of time Anderson asked Burnett if Burnett could get him a half gram of cocaine. Burnett replied by stating, "Wait 'til Gus gets here." Burnett further stated that the price would be $35.00 for one half gram. At approximately 12:10 A.M. on August 30, 1984, Anderson handed Burnett two $20.00 bills. About twenty minutes later, Burnett handed Anderson a folded napkin. Anderson unfolded

the napkin and found a clear plastic bag containing a white powdery substance. Anderson then placed the clear plastic bag in his left front pocket.

12. On the evening of August 30, 1984, Detective Anderson entered the licensed premises again. Investigator Oliva and Detective Vadnel entered the premises at about the same time in an undercover capacity as back up. Detective Anderson met with a white male patron previously identified as Dion Burl. Anderson asked Burl if he could get Anderson a half gram of cocaine. Burl replied in the affirmative. Detective Anderson then handed Burl two folded $20.00 bills, which were wrapped in a cocktail napkin. Burl took the money and left. At approximately 11:50 P.M. Burl returned to the upstairs portion of the premises and sat at a table with Detective Anderson. At this time Burl handed Anderson a folded cocktail napkin and inside the folded napkin was a small clear plastic bag containing a white powdery substance.

13. On that same evening, August 30, 1984, Detective Anderson met with a white male waiter identified as Tony Brown who was working at the upstairs portion of the licensed premises. Anderson and Brown engaged in a conversation while standing approximately three feet from Investigator Oliva. Anderson asked Brown if Brown could obtain a half gram of cocaine. Brown replied by stating, "It will be about twenty minutes." Detective Anderson gave two $20.00 bills to Brown and told Brown that he would be in the downstairs portion of the licensed premises. At approximately 12:10 A.M. on August 31, 1984, Detective Anderson, while standing at the downstairs portion of the licensed premises was approached by Brown, who handed Anderson a folded white cocktail napkin which contained a clear plastic bag containing a white powdery substance. Anderson inspected the plastic bag and then placed the napkin and its contents in his right rear pants pocket.

14. On or about August 31, 1984, at approximately 11:30 P.M., Detective Anderson again entered the licensed premises. At about the same time Detective Vadnel and Investigator Oliva entered the licensed premises in an undercover capacity as back up. Shortly after midnight (in the early morning minutes of September 1, 1984) Detective Anderson met with white male waiter Adam Burnett and engaged in a general conversation. Detective Anderson asked Burnett if Burnett could get Anderson a half gram of cocaine. Burnett replied in the affirmative. Thereupon Detective Anderson gave Burnett $40.00 in U.S. currency by laying two $20.00 bills on a cocktail tray Burnett was carrying. Burnett walked away from Detective Anderson to an unknown portion of the licensed premises. A few minutes later Burnett returned to where Detective Anderson was standing and handed

184

Anderson a magazine tatles "David" and said, "It's in the magazine." Detective Anderson, who was standing near the dance floor of the licensed premises, took the magazine and flipped throught its pages, at which time a clear plastic bag containing a white powdery substance fell to the floor. Several patrons standing in the vicinity of Anderson saw the clear plastic bag fall to the floor and laughed at Anderson's clumsiness. Detective Anderson then picked up the clear plastic bag and held it up to eye level to inspect it. He then placed it in his pocket.

15. On the evening of September 5, 1984, Detective Anderson again entered the licensed premises. Shortly thereafter Detective Vadnel and Investigator Oliva entered the licensed premises in an undercover capacity as back up. Detective Anderson met with a white male patron previously identified as Dion Burl and asked Burl if he could purchase a half gram of cocaine. After some conversation, Anderson gave two $20.00 bills to Burl. Detective Anderson then told Burl that he would be sitting on a speaker near the west end of the dance floor and that Burl could deliver the cocaine to him there. At approximately 10:45 P.M., Burl approached Detective Anderson, who was seated on a speaker by the dance floor, and sat next to Anderson. Burl then handed a folded cocktail napkin to Detective Anderson. Inside the cocktail napkin was a small clear plastic bag containing a white powdery substance. Detective Anderson examined the plastic bag and then placed it is his pocket.

16. After concluding the cocaine purchase of September 5, 1984, at the licensed premises, Detective Anderson remained on the licensed premises and during the early morning hours of September 6, 1984, he met with a white male waiter previously identified as Adam Burnett. Detective Anderson asked Burnett if he could get Anderson a half gram of cocaine. Burnett stated that "Gus," referring to the supplier, was not yet at the bar, but that he should be able to obtain some later. A few minutes later, Burnett approached Anderson and stated that Gus was present and Anderson handed Burnett two folded $20.00 bills in U.S. currency. Anderson then stated to Burnett that he would be in the downstairs portion of the premises. A short while later Burnett approached Anderson and handed Anderson what appeared to be a mixed drink with a napkin wrapped around the glass. As he handed the glass to Anderson, Burnett said, "It's just water, but look in the napkin." Anderson set the drink down and unfolded the napkin to expose a small clear plastic bag containing a white powdery substance. Detective Anderson placed the plastic bag in his pocket.

17. At approximately 12:30 A.M. that same evening (prior to purchasing the cocaine from Burnett), Detective Anderson met with a

white male waiter previously identified as Everett Campbell and engaged in a general conversation with Campbell. Shortly thereafter Detective Anderson asked Campbell if he could get Anderson a half gram of cocaine. Anderson gave Campbell two folded $20.00 bills in U.S. currency. Approximately two minutes later Campbell returned from an unknown location in the restaurant area of the licensed premises and handed Anderson a small clear plastic bag containing a white powdery substance. Anderson took the plastic bag and held it up to inspect it. The bartender at bar number two could have seen Anderson inspecting the plastic bag. Anderson then placed the plastic bag in his pocket.

18. On the evening of September 10, 1984, Detectives Anderson and Vadnel and Investigator Oliva returned to the licensed premises in an undercover capacity. Anderson engaged in a brief conversation with a white male waiter previously identified as Everett Campbell, who was not working on this date. Anderson asked Campbell if he could get Anderson a half gram of cocaine. Campbell replied in the affirmative. Detective Anderson then handed Campbell a $50.00 bill, which Campbell took. Campbell took the $50.00 bill to a bartender, received change for it, and gave Anderson $10.00. Campbell then went out the front door. At approximately 1:00 A.M. on September 11, 1984, Campbell re-entered the licensed premises and met with Detective Anderson who was standing next to Investigator Oliva. At this time Campbell handed Anderson a clear plastic bag containing a white powdery substance. This transaction was observed by an on-duty white male bartender identified only as "Don" and by a white male patron who was standing on the opposite side of Anderson. Detective Anderson took the clear plastic bag and placed it on the bar counter where it remained for two or three minutes in plain view of the bartender. Then Anderson took the plastic bag and attempted to place it in his pants pocket at which time the small plastic bag containing the white powdery substance fell to the floor where Detective Vadnel, Investigator Oliva, and the white male patron previously mentioned observed the same. Detective Anderson retrieved the clear plastic bag from the floor and placed it in his pants pocket.

19. At all times material to this case, the following were employees on the licensed premises. Malcolm Perkins, Richard Christian, Everett Campbell, Adam Burnett, Tony Brown and a bartender identified as "Don."

20. Each and every one of the clear plastic bags containing a white powdery substance which were sold to Detective Anderson and to Investigator Oliva on the licensed premises during August and Septem-

ber of 1984 were properly examined by a forensic chemist. The contents of each and every one of those clear plastic bags was found to contain cocaine.

21. In brief summary of the foregoing, during the 5-week period from August 7, 1984, through September 11, 1984, the following events occurred on the licensed premises:

8/07/84 Employee Malcolm Perkins told Detective Anderson he could obtain MDA.

8/07/84 Assistant Manager Scott Keihl and employee "Paul/Miss Kitty" discussed drugs with Detective Anderson without alarm or concern.

8/10/84 Employee Richard Christian sold cocaine to Detective Anderson.

8/17/84 Employee Malcolm Perkins told Detective Anderson that employee Everett Campbell could obtain cocaine for Anderson.

8/17/84 Employee Everett Campbell agreed to sell cocaine to Detective Anderson.

8/19/84 Employee Everett Campbell sold cocaine to Detective Anderson.

8/21/84 Patron Dion Burl sold cocaine to Detective Anderson.

8/23/84 Employee Everett Campbell sold cocaine to Detective Anderson.

8/24/84 Employee Everett Campbell sold cocaine to Detective Anderson

8/25/84 Employee Richard Christian sold cocaine to Detective Anderson.

8/25/84 Employee Adam Burnett sold cocaine to Investigator Oliva.

8/29/84 Employee Tony Brown offered to sell cocaine to Detective Anderson.

8/30/84 Employee Adam Burnett sold cocaine to Detective Anderson.

8/30/84 Patron Dion Burl sold cocaine to Detective Anderson.

8/31/84 Employee Tony Brown sold cocaine to Detective Anderson.

9/01/84 Employee Adam Burnett sold cocaine to Detective Anderson.

9/05/84 Patron Dion Burl sold cocaine to Detective Anderson.

187

9/06/84 Employee Adam Burnett sold cocaine to Detective Anderson.

9/06/84 Employee Everett Campbell sold cocaine to Detective Anderson.

9/11/84 Employee Everett Campbell sold cocaine to Detective Anderson.

22. All of the events summarized immediately above took place on the licensed premises during business hours when other employees and patrons were also present on the licensed premises. With the one exception which occurred on August 25, 1984, when Richard Christian reached out to close Detective Anderson's hands so that Anderson would not display a plastic bag containing cocaine, the employees at the licensed premises did not express any concern about any of the drug transactions and did not take any action to prevent or discourage them.

23. Richard DeSanto is the sole officer, director, and shareholder of Club 99, Inc., the licensee in this case. Richard DeSanto is a self-employed attorney in good standing with the Florida Bar. He has been a practicing attorney for six years and maintains an active trial practice.

24. DeSanto does not devote very much time to the management of the licensed premises. The day-to-day management is conducted by a manager and an assistant manager, both hired by DeSanto. The manager is Tommy Engelbrecht and the assistant manager is Scotty Kiehl. DeSanto relies on Engelbrecht to relay DeSanto's instruction about the operation of the licensed premises to the other employees and also relies on Engelbrecht to report back to him regarding any problems in the operation of the licensed premises. Engelbrecht does the hiring and firing at the licensed premises and many of the employees on the licensed premises would not even recognize DeSanto. DeSanto visits the licensed premises about twice a month on a deliberately irregular schedule. Some of his visits are as brief as a few minutes; others are as long as several hours. The primary purpose of his visits is to attend to such things as reviewing business records and signing the payroll. DeSanto has established as policies that intoxicated or disorderly patrons should not be permitted to enter the licensed premises and that patrons who become disorderly once they are inside the licensed premises should be ejected. It is also a policy of the club that if the employees become aware of any drug activity on the licensed premises they are supposed to report the incident to the manager or assistant manager, and the manager or assistant manager is supposed

188

to eject whoever is involved in the drug activity. On three or four occasions during the past year or so patrons have been ejected for drug activities on the licensed premises.

25. DeSanto has discussed drug problems and their prevention with Engelbrecht. All new employees are told about the drug policy at the licensed premises when they are first hired. Engelbrecht has also held a few employee meetings at which he reminded employees of the drug policy. The drug policy established by DeSanto appears to include a policy of firing any employee who is caught with drugs on the premises. During the past year three waiters have been fired on the spot for drug use. In the past year the manager has also been told of three or four instances of drug dealing on the licensed premises.[3]

26. There are no written personnel rules and regulations. Thus, all of DeSanto's policies are communicated orally to Engelbrecht and are then communicated orally by Engelbrecht to the employees. The entire management of the licensed premises, including management practices concerning hiring of personnel, appear to be very informal. Further, the personnel policies regarding drug activities on the licensed premises are either ineffectively communicated or ineffectively enforced. For example, none of the drug transactions engaged in by Detective Anderson and Investigator Oliva were reported to the manager or assistant manager, and no efforts were made to eject Anderson or Oliva for engaging in drug transactions or attempting to engage in drug transactions, even though some of their transactions were observed by employees who were not involved in the transactions. Further, at least one employee (Richard Christian) knew that a patron named Gus was regularly dealing in cocaine on the licensed premises, but no action was taken to eject Gus.[4] Yet another example of the informality of the licensee's personnel practices is that even though Engelbrecht had recently hired a bartender named "Don" and had supposedly carefully checked with Don's references, Engelbrecht could not remember Don's last name.

27. When alcoholic beverage licenses were renewed in March of 1983, the DABT sent information to all licensees advising them that the DABT was willing to provide them with suggestions for controlling drug activity on the licensed premises. DeSanto did not take advantage

---

[3] Presumably, (although the record is not completely clear on this point), these are the same three or four people who were ejected from the premises for engaging in drug activities on the licensed premises.

[4] Gus was among those arrested on the night that the DABT's suspension order was served.

of this opportunity to obtain suggestions from DABT because he did not think he had a drug problem on the licensed premises.

28. In making the foregoing findings of fact I have given careful consideration to the proposed findings of fact contained in the parties' post-hearing submissions to the Hearing Officer. To the extent that findings of fact proposed by either party are not incorporated in the foregoing findings of fact, the proposed findings have been specifically rejected because they were not supported by competent substantial evidence, because they were contrary to the greater weight of the evidence, because they involve incidental details which were not essential to the resolution of this case, or because they were irrelevant or immaterial.

## CONCLUSIONS OF LAW

Based on the foregoing facts and on the applicable statutory, rule, and case law, I make the following conclusions of law:

(1) The division is given full power and authority to revoke or suspend the license of any person holding a license under the Beverage Law, when it is determined or found by the division upon sufficient cause appearing of:

(2) Violation by the licensee or his or its agents, officers, servants, or employees, on the licensed premises, or elsewhere while in the scope of employment, of any of the laws of this state or of the United States, or violation of any municipal or county regulation in regard to the hours of sale, service, or consumption of alcoholic beverages, or engaging in or permitting disorderly conduct of the licensed premises to violate any of the laws of this state or of the United States. . . .

(b) . . . .

(c) Maintaining a nuisance on the licensed premises.

(3) The division may impose a civil penalty against a licensee for any violation mentioned in the Beverage Law, or any rule issued pursuant thereto, not to exceed $1,000 for violations arising out of a single transaction. If the licensee fails to pay the civil penalty, his license shall be suspended for such period of time as the division may specify.

3. Section 823.10, Florida Statutes, declares a place or building where controlled substances are illegally kept, sold, or used, to be a nuisance. And Section 893.13(2)(a)(5), Florida Statutes, makes it unlawful for any person:

To keep or maintain any store, shop, warehouse, dwelling, building, vehicle, boat, aircraft, or other structure or place which is resorted to by persons using controlled substances in violation of this chapter for the purpose of using these substances, or which is used for keeping or selling them in violation of this chapter.

4. Cocaine is a controlled substance, and it is a violation of state law to sell, use, deliver, or possess cocaine Section 893.13, Florida Statutes.

5. The negotiation of a sale of a controlled substance or the act of serving as a go-between in arranging such a drug transaction is a violation of Florida law and a person committing any such acts is subject to conviction under the criminal laws of Florida. *Nadjawski v. State,* 371 So.2d 554 (Fla. 2d DCA 1979); *State v. Hubbard,* 328 So.2d 465 (Fla. 2d DCA 1976); *State v. Dent,* 322 So.2d 543 (Fla. 1975). Section 777.011, Florida Statutes.

6. There is no real dispute in this case about whether the events alleged in the Notice To Show Cause actually occurred. There was an abundance of competent substantial evidence to support each of the charges. The real dispute is over whether the facts charged and proved are sufficient to warrant the penalty of revocation of license.

The dispositive court decision appears to be *Lash, Inc. v. State, Department of Business Regulation,* 411 So.2d 276 (Fla. 3d DCA 1982). The operative facts before the court in the *Lash* case are described as follows at page 277 of the decision:

The license revocation stemmed from narcotics violations on appellant's premises. The evidence established that on five occasions over a period of a week, undercover beverage agents purchased controlled substances from two of the appellant's employees.

7. At page 278 of its decision, the court in *Lash* expounds at length on the proper standard for revocation or suspension of a beverage license.

Under Section 561.29(1), where the unlawful activity is committed by the licensee's agent, simple negligence is sufficient for revocation. Admittedly, the courts have refused to uphold revocations when the evidence showed only that on one occasion the licensee's employees violated the laws, and that the licensee otherwise took measures to comply with them. (citation omitted) Where, however, the laws are repeatedly and flagrantly violated by the employees, an inference arises leading to the conclusion that such violations are either fostered, condoned or negligently overlooked by the licensee, notwithstanding his absence from the premises when the violations

**191**

occur. (citation omitted) Consequently, if the evidence supports the conclusion that the licensee failed to exercise ordinary care in supervision of his emploees, he can be found negligent and his license revoked. (citation omitted)

Where the violations are, as here, committed in a persistent and recurring manner consisting of more than one isolated incident, the courts have not hesitated to find that such violations were either fostered, condoned, or negligently overlooked by the licensee, even though he may have been absent at the time of the commission of such. (citation omitted) In the present case, the recurring sales were made possible by appellant's failure to supervise the premises and his employees in a reasonably diligent manner, properly leading to the license revocation.

8. Application of the standard set forth in *Lash* virtually compels revocation when the facts in the *Lash* case are compared with the facts in this case. In *Lash* the violations took place over a *one-week* period. Here the violations took place over a *five-week* period. In *Lash* two employees of the licensee made unlawful sales of controlled substances. Here *four* employees of the licensee made unlawful sales of controlled substances on the licensed premises. In *Lash* there were a total of *five* unlawful sales of controlled substances by the licensee's employees. Here there were *twelve* unlawful sales of controlled substances by the licensee's employees on the licensed premises, plus three more such sales on the licensed premises by a patron.

9. The violations proved here are greater in number than those proved in *Lash* and occurred over a greater period of time. Accordingly, where the unlawful activity is more persistent and recurring than in the *Lash* case, the appropriate penalty should be no less than that imposed in the *Lash* case, absent some convincing evidence tending to prove that the unlawful activities took place in spite of the licensee's exercise of due diligence to detect and prevent it. There is no such evidence in this case. To the contrary the evidence specifically establishes the contrary. The licensee spends precious little time at the licensed premises and what little time he does spend there seems to be devoted primarily to attention to business records and financial matters. The licensee has not taken an active role in the firing, training, or supervision of employees; he does not even know some of the employees. Similarly, he has not formulated any written rules or procedures to regulate the conduct of employees or the operation of the licensed premises. The licensee's attitude towards the day-to-day operations of the licensed premises, as reflected by his actions, could charitably be described as casual, and more accurately be described as indifferent.

Perhaps the demands of an active trial practice make it virtually impossible for the licensee to devote more than a few hours a month to his responsibilities as a beverage licensee. But just as a lawyer would not be excused for failing to prepare a client's case for trial because of not having enough time to get around to it, an alcoholic beverage licensee cannot be excused because he did not have time to supervise the premises and his employees in a reasonably diligent manner. In sum: the licensee was negligent by failing to supervise the licensed premises and his employees in a reasonably diligent manner.

10. All of the charges against the licensee have been proved by competent substantial evidence. Under the standards set forth in the *Lash* case, revocation of the license is clearly warranted. Accordingly, I make the following recommendation.

## RECOMMENDED ORDER

For all of the foregoing reasons it is recommended that the Division of Alcoholic Beverages and Tobacco enter a Final Order revoking alcoholic beverage license number 16-1053-SRX, Series 4-COP, issued to Club 99, Inc., trading as Shangri-La.